1 | Daniel P. Ayala, Cal. Bar No. 174093
AYALA & ASSOCIATES
2 | 520 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
3 | Telephone: (702) 893-2015
Facsimile:  (702) 893-2042

4 | Charles G. La Bella, Cal. Bar No. 183448
Matthew C Elstein, Cal. Bar No. 174400
5 | LA BELLA & MCNAMARA, LLP
401 West A Street, Suite 1150
6 | San Diego, CA 92101
Telephone: (619) 696-9200
7 | Facsimile:  (619) 696-9269

8 | Attorneys for Plaintiffs RLLW, INC., RLW, INC., JACKIE ROBINSON,
MICHAEL LOYD, FLINTIE WILLIAMS, RICK MOOS, REGGIE THEUS,
9 | DAVID K. GREENWOOD and CLARK PARKER

10

## UNITED STATES DISTRICT COURT

11

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13 | RLLW, INC., a Nevada corporation; | ) | Case No.:  CV-03-4647-TJH (PJWx)
RLW, INC., a Nevada corporation; | ) |
14 | JACKIE ROBINSON, an individual; | ) | **SECOND AMENDED COMPLAINT**
MICHAEL LOYD, an individual; | ) | **FOR:**
15 | FLINTIE WILLIAMS, an individual; | ) |
RICK MOOS, an individual; REGGIE | ) | **(1)   FRAUD AND DECEIT**
16 | THEUS, an individual; DAVID K. | ) |
GREENWOOD, an individual; and | ) | **(2)   PROFESSIONAL**
17 | CLARK PARKER, an individual, | ) | **NEGLIGENCE**

Plaintiffs, | ) | **(3)   NEGLIGENT HIRING,**
18 | | ) | **TRAINING, AND**
| ) | **SUPERVISION**
19 | v. | ) |
| ) | **(4)   BREACH OF THE**
20 | JULIAN MOVSESIAN, an individual; | ) | **IMPLIED COVENANT OF**
CAPITAL MANAGEMENT | ) | **GOOD FAITH AND FAIR**
21 | STRATEGIES, INC., a California | ) | **DEALING**
corporation; AMERICAN | ) |
22 | INTERNATIONAL GROUP, INC., a | ) | **(5)   REFORMATION**
Delaware corporation; A.I. CREDIT | ) |
23 | CONSUMER DISCOUNT | ) | **(6)   RESCISSION**
COMPANY, a Pennsylvania | ) |
24 | corporation; MASSACHUSETTS | ) | **(7)   CIVIL RICO VIOLATIONS**
MUTUAL LIFE INSURANCE | ) | **[18 U.S.C. § 1962(c)]**
25 | COMPANY, a Massachusetts | ) |
corporation; C.M. LIFE INSURANCE | ) | **(8)   UNFAIR COMPETITION**
26 | COMPANY, a Connecticut corporation; | ) | **(CAL. BUS. & PROF. CODE**
AMERICAN GENERAL LIFE | ) | **§ 17200)**
27 | INSURANCE COMPANY, a Texas | ) |
corporation, | ) |
28 | Defendants. | ) |

DOCKETED ON CM

NOV 24 2004

BY _____ 010

Plaintiffs RLLW, Inc., RLW, Inc., Jackie Robinson, Michael Loyd, Flintie Williams, Rick Moos, Reggie Theus, David K. Greenwood, and Clark Parker, for their Second Amended Complaint, allege as follows:

## JURISDICTION AND VENUE

1.      In the seventh claim for relief of the Second Amended Complaint, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961, *et seq*.  This Court has jurisdiction over the Civil RICO claim pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 (federal question jurisdiction).  This Court has supplemental jurisdiction of the remaining claims for relief of the Second Amended Complaint pursuant to 28 U.S.C. § 1367(a), as these claims form part of the same case or controversy as the RICO claim.

2.      Venue of this action is proper in the Central District of California because the Defendants may be found in this District.  18 U.S.C § 1965(a); 28 U.S.C § 1391(b)(3).

## PARTIES

### Plaintiffs

3.      Plaintiff RLLW, Inc. ("RLLW") is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

4.      Plaintiff RLW, Inc. ("RLW") is a Nevada Corporation with its principal place of business in Las Vegas, Nevada.

5.      Plaintiffs Jackie Robinson, Michael Loyd, and Flintie Williams are and at all times material to this action were residents and citizens of the State of Nevada.

6.      Plaintiffs Rick Moos, Reggie Theus, David K. Greenwood, and Clark Parker are and at all times material to this action were residents and citizens of the State of California.

**Defendants**

7.     Defendant Julian Movsesian ("Movsesian") is and at all times material to this action was a citizen of the State of California residing within this District.

8.     Defendant Capital Management Strategies Inc. ("CMSI") is and at all times material to this action was a California corporation, with its principal place of business in Newport Beach, California.  Movsesian is the owner and president of CMSI.  Movsesian and CMSI are hereinafter referred to collectively as "Movsesian," and unless otherwise indicated all references to Movsesian include CMSI.

9.     Defendant American International Group, Inc. ("AIG"), is a Delaware corporation, with its principal place of business in New York City, New York.  AIG is the corporate parent of Defendants AI Credit Consumer Discount Company ("AI Credit"), and American General Life Insurance Company ("American General").  AIG transacts business in this District directly, and through its agents and corporate subsidiaries, and therefore may be found in this District.

10.     Defendant AI Credit is a Pennsylvania corporation with its principal place of business in New York City, New York.  AI Credit transacts business in this District, and therefore may be found in this District.

11.     Defendant Massachusetts Mutual Insurance Company ("Mass Mutual") is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts.  Mass Mutual transacts business in this District, and therefore may be found in this District.

12.     Defendant CM Life Insurance Company ("CM Life") is a Connecticut corporation with its principle place of business in Hartford, Connecticut.  CM Life transacts business in this District, and therefore may be found in this District.

13.   Defendant American General is a Texas corporation with its principal place of business in Houston, Texas.  American General transacts business in this District, and therefore may be found in this District.

14.   Plaintiffs are informed and believe on that basis allege that each Defendant was acting as an agent, servant, partner and/or joint venturer of each of the remaining Defendants, and in connection with the matters herein, was acting in the course and scope of such agency.  Plaintiffs are further informed and believe and on that basis allege that each Defendant, while acting as principal, expressly directed, acted with knowledge of, authorized, affirmed, consented to, ratified, encouraged, approved, adopted and/or participated in the acts or transactions of the other Defendants.  In particular, Plaintiffs are informed and believe and on that basis allege that Defendant Movsesian was the actual and/or ostensible agent of the other Defendants.  Numerous facts establish this agency relationship, many of which are alleged below, including, but not limited to: (i) at all times material to this action Movsesian was and is registered with the California Department of Insurance as an agent for Defendants American General, CM Life, and Mass Mutual; (ii) at all times material to this action Movsesian held himself out to be the agent of Defendants American General, CM Life, Mass Mutual, AI Credit, and AIG; and (iii) at all times material to this action numerous individuals, including representatives of Defendants American General, CM Life, Mass Mutual, AI Credit, and AIG, informed the Plaintiffs and their representatives that Movsesian was acknowledged in the insurance and financial services industries "throughout the United States" as the "exclusive agent" for the Defendants regarding the "Capital Maximization Strategy" program. Movsesian and the Defendants told Plaintiffs that Movsesian developed this program in concert with the Defendants.

3

1    15.    Plaintiffs are informed and believe and thereon allege that at all

2    times material to this action, Defendants acted in concert, conspired, and agreed

3    among themselves to commit the wrongful acts and practices alleged in this

4    Second Amended Complaint, and that such wrongful acts and practice were

5    committed pursuant to and in furtherance of such conspiracy and agreement, and

6    with the consent, approval and/or ratification of each of the Defendants.

7    Plaintiffs are informed and believe and thereon believe that each of the

8    Defendants is liable as a direct participant, co-conspirator and/or an aider and

9    abettor of the wrongful acts and practices alleged herein.

10                          **GENERAL ALLEGATIONS**

11                        **Defendants' Deceptive Scheme**

12    16.    The Defendants orchestrated a fraudulent scheme calculated to

13    induce Plaintiffs and other members of the public to purchase large amounts of

14    unnecessary and grossly expensive life insurance as a vehicle to secure

15    commercial loans.  Plaintiffs were among the first victims of Defendants'

16    scheme.  As a result of this deceptive scheme, Plaintiffs and other members of

17    the public were duped into paying exorbitant insurance premiums, and at the

18    same time undertaking the obligation to repay large commercial loans.  The

19    Defendants -- holding themselves out as "elite" companies, professionals, and

20    experts in the insurance and finance fields with specialized knowledge in

21    insurance planning, financial planning, commercial financing, and capital

22    management and maximization strategies -- devised and executed this deceptive

23    scheme to improperly enrich themselves at the expense of the economic interests

24    and peace of mind of the Plaintiffs, and other members of the public.

25    17.    Moreover, Plaintiffs are informed and believe, and on that basis

26    allege, that Defendant AIG and its wholly owned lending subsidiary, AI Credit,

27    have compounded the injury suffered by Plaintiffs and others as a result of the

28    scheme.  AIG and AI Credit have breached the covenant of good faith and fair

dealing implied in the loan transaction documents with the Plaintiffs and others by: (i) asserting that the loan proceeds could not be used for business purposes despite language to the contrary contained in the promissory notes and despite actual knowledge of Plaintiffs' intended use of the loan proceeds; (ii) demanding various changes in the terms of the loans -- including additional collateral and a specific principle pay-off date -- without a basis under the loan agreements, and without additional consideration; (iii) threatening to institute, and instituting, baseless litigation -- including claims of fraud -- against Plaintiffs when they failed to comply with AI Credit's improper demands; (iv) instituting legal proceedings asserting that Plaintiffs failed to pay insurance premiums, constituting a default under the loan documents, when Defendant AI Credit was aware of and authorized payment of Plaintiffs' insurance premium payments from the cash value of Plaintiffs' insurance policies; (v) improperly claiming that Plaintiffs are in default on the loan agreements; (vi) accelerating repayment of the loans based on non-material breaches of the loan agreements; (vii) attempting to lure Plaintiffs into defaulting on their interest payment obligations by refusing to provide Plaintiffs with invoices for interest due on the loans, despite Plaintiffs requests for such statements and despite Defendant AI Credit's obligation to provide such statements under the terms of the Promissory Notes; (viii) refusing Plaintiffs' tender of hundreds of thousands of dollars in interest payments and refusing to explain the basis for such refusal despite numerous requests by Plaintiffs; and (ix) instituting legal proceedings asserting that Plaintiffs failed to pay interest payments.

18.   Movsesian was the "front man" for the deceptive scheme. Movsesian is an insurance salesman and self-proclaimed "financial wizard."[1]

---

[1]   Notably, Plaintiffs are informed and believe, and on that basis allege, that the California Department of Insurance revoked Movsesian's license to sell insurance in 1984, and the Department did not fully reinstate the license until 1995.

5

Movsesian approached individuals who were seeking low interest loans for business investments. Movsesian advised prospective borrowers that he could secure and fund a loan for them at extremely low interest rates through a unique program that he claimed he devised. He called this program the Capital Maximization Strategy ("CMS"). Under the CMS program, Movsesian claimed he would fund a low interest loan, secured by a life insurance policy on the borrower's life. He represented that the CMS Program was "no risk": (i) if the borrower died, the life insurance policy would pay off the loan; and (ii) if the insurance premiums were paid over a certain period of time, the cash value of the policy would be sufficient to pay off the loan. Thus, under either circumstance, the underlying loan would be paid off, and therefore the CMS program was supposed to be virtually risk free to the borrower.

19. Movsesian's representations were false, fraudulent, and misleading. Defendants AIG, AI Credit, American General, Mass Mutual, and CM Life authorized Movsesian to make these false, fraudulent, and misleading representations. These Defendants ratified the false, fraudulent, and misleading representations and Movsesian's related conduct. Movsesian also stated that he made these representations with the authority of Defendants AIG, AI Credit, American General, Mass, Mutual, and CM Life, and these Defendants directly benefits from these false, fraudulent, and misleading representations, to the detriment of Plaintiffs. As alleged more fully below, the false, fraudulent, and misleading representations fall into seven general categories:

> a. Movsesian fraudulently represented that the gravamen of the CMS program was a loan for business purposes, that the insurance policies were ancillary to the loan, and that the insurance policies were merely a non-traditional mechanism for paying the loan principle. In fact, the purpose of the CMS program was the sale of excessive amounts of life

insurance at very high rates, to the benefit of Movsesian and his principals.

b.   Movsesian and the Defendants held themselves out as an "experts" in the fields of insurance, financing, and "leveraged" borrowing programs.  Based upon this alleged expertise, Movsesian and the other Defendants represented that they could provide Plaintiffs with a package of appropriate, low cost loans and related insurance, with a feasible loan repayment plan consistent with the Plaintiffs goals, objective, insurance needs, and financial posture.  In fact, Movsesian, acting for himself and on behalf of the other Defendants, fraudulently failed to disclose that he and the other the Defendants had no intention of providing the Plaintiffs with a low cost business loan, or arranging a feasible loan repayment plan.  Rather, Movsesian, acting for himself and as the agent of the other Defendants, was interested solely in reaping lucrative commissions, fees and profits from the sale of life insurance, and in securing large premium and interest payments for the Defendants.

c.   Movsesian and the other Defendants fraudulently represented that the face value and type of insurance (whole, term, variable, or universal) that borrowers were required to purchase in connection with the loans was determined by the amount of money borrowed.  In substance, Movsesian and the other Defendants represented that the interest being insured was only the loan principal.  In fact, the essence of the transaction was just the opposite.  The insurance policies were placed first, and the amounts and types of insurance

dictated, in substantial part, the terms of the loans.
Moreover, the life insurance policies sold were in much
larger amounts, and at much higher premiums, than actually
needed to secure the loans. As a result, the borrowers
needlessly paid exorbitant insurance premiums.

d.  Movsesian and the other Defendants fraudulently "churned"
life insurance, in that they represented that Plaintiffs and
others had to surrender their existing life insurance, and
replace them with life insurance policies issued by the
Defendants. The policies issued by the Defendants were in
much larger amounts, and at much higher premiums, than the
life insurance policies previously held by the Plaintiffs and
others.

e.  Movsesian and the other Defendants fraudulently represented
that the cash values of the insurance policies would
accumulate in amounts sufficient to pay down the loan
principle within a certain term of years. In fact, the cash
values are not sufficient to pay loan principles within that
term.

f.  While holding himself out as an "expert" in finance,
insurance, and "leveraged" borrowing programs, Movsesian,
individually and on behalf of the other Defendants,
fraudulently represented that the interest payments and
insurance premiums were tax deductible.

g.  Movsesian, for himself and for Defendants AI Credit and
AIG, fraudulently represented that loan funds could be used
to invest in business ventures. AI Credit and AIG now

1    contend that the loans could not be used for such

2    investments.

3    20.    Movsesian made these false, fraudulent, and misleading

4    representations in his capacity as the agent of the other Defendants, and they

5    approved of, directed, ratified, and/or accepted the benefits flowing from these

6    false, fraudulent, and misleading representations.

7    21.    To reduce the risk of exposure of the deceptive scheme, and

8    consistent with his representation that he was the exclusive agent of the other

9    Defendants in connection with the CMS program, Movsesian advised the

10    prospective borrowers that the CMS programs constituted trade secrets and

11    Movsesian required the execution of non-disclosure agreements in connection

12    with the transactions.  Movsesian told Plaintiffs and other borrowed that under

13    no circumstances were they to directly contact the other Defendants concerning

14    the transactions.  Plaintiffs and other borrowers relied upon Movsesian's

15    representations.

16    22.    Plaintiffs are informed and believed, and on that basis allege, that

17    the Plaintiffs and many other members of the public were deceived into

18    accepting the deceptive proposal and programs.  As a result, Plaintiffs and many

19    other members of the public were deceived into paying Defendants millions of

20    dollars in fees, commissions, premiums and interest payments.

21    **Defendants Snare The South Market Group With The Scheme**

22    *The South Market Group's Need For a Competitive Loan*

23    23.    In the spring of 1997, Pizza Hut, Inc. presented a group of

24    businessmen with an investment opportunity.  The group consisted of Plaintiffs

25    Jackie Robinson, Michael Loyd, Flintie Williams, and another individual, Gary

26    Lindstrom (the "South Market Group").  Messrs. Robinson, Loyd and Williams

27    are African-American.  They learned that Pizza Hut was interested in increasing

28

9

1   the number of minorities in its franchisee ranks, and was seeking a buyer for its

2   South San Diego County franchise (the "South Market").

3       24.    The purchase price of the South Market was approximately $9

4   million, and Pizza Hut required the South Market Group to make an equity

5   investment of approximately 20%, or approximately $1.8 million dollars. The

6   balance of the purchase price was to be financed.

7       25.    In their search for a competitive loan to fund their equity

8   contribution, the South Market Group was introduced to Movsesian. Movsesian

9   said he was a principal of CMSI.

10       26.    Movsesian represented to the South Market Group that he was a

11   lender. He also represented that he and the other Defendants were "experts" in

12   the fields of insurance, financing, and "leveraged" borrowing programs. He

13   represented that in that capacity he could obtain a loan for the South Market

14   business opportunity at an extremely low interest rate through his unique CMS

15   Program. Movsesian emphasized that the rate through the CMS program was

16   better than a conventional business loan. Movsesian represented that pursuant to

17   the program, he and the other Defendants could provide a low interest loan,

18   secured by life insurance polices on the lives of the members of the South

19   Market Group. Movsesian stated that the South Market Group would be

20   required to make interest only payments to the lender, AI Credit, and that the

21   money paid towards insurance premiums would generate cash values in the

22   policies sufficient to pay off the principal balance of the loan within ten years.

23   At that point, the South Market Group could choose to use the cash values to

24   pay off the loan, or retain them until death. Movsesian represented that the

25   loans were unique because they would never come due unless the South Market

26   Group failed to pay interest on the loans, or failed to pay premiums on the

27   insurance, or the members of the Group died. Movsesian further represented

28   that the program involved little risk because if any of the borrowers died, their

1   life insurance policies would pay off the loan.  As an added benefit, Movsesian

2   told the South Market Group that any cash value in the policies in excess of the

3   loan principal upon death would be paid to their heirs.  Movsesian further

4   represented that the face value and type of insurance Group members were

5   required to purchase was determined by the amount of money borrowed in the

6   loan transaction.  Finally, Movsesian represented that the interest payments and

7   insurance premium payments were tax deductible.  These representations by

8   Movsesian were made at the direction of, with the approval of, and/or were

9   ratified by, the other Defendants.

10          *AI Credit Endorses and Ratifies Movsesian and The Deceptive Scheme*

11          27.    In an effort to confirm the legitimacy of Movsesian and the CMS

12   program, the South Market Group contacted AI Credit, which Movsesian

13   identified as the lender participating with him in the CMS loan program.  AI

14   Credit representatives, including AI Credit Senior Director Kevin Ferguson,

15   advised the South Market Group that AI Credit knew Movsesian well, that

16   Movsesian was AI Credit's agent, and that AI Credit had worked with

17   Movsesian on many loan transactions.  Upon learning of this contact, Movsesian

18   was incensed.  He instructed the South Market Group that he should be their

19   sole contact with AI Credit.

20          *The South Market Group Unwittingly Accepts the Scheme*

21          28.    Reasonably relying on AI Credit's endorsement of Movsesian and

22   his loan program, and being unaware of the truth regarding the numerous

23   fraudulent misrepresentations alleged above (in particular as alleged in

24   paragraphs 18 through 22 and paragraph 26) regarding the CMS program and

25   the deceptive scheme, the South Market Group accepted the Defendants'

26   proposal.

27          29.    Movsesian thereafter funded a $1.75 million loan from AI Credit to

28   the South Market Group for its equity contribution towards the South Market

purchase.  At the same time, Movsesian also arranged for the issuance of life insurance policies covering the members of the South Market Group.  According to Movsesian, this insurance was an integral part of the loan funding mechanism.  The life insurance polices were issued by CM Life with the following face amounts and annual premiums:

| Insured | Insurer | Policy Number | Policy Face Value | Annual Premium |
|---------|---------|---------------|-------------------|----------------|
| Jackie Robinson | CM Life | 6238452 | $4 million | $34,956 |
| Michael Loyd | CM Life | 6238503 | $2.8 million | $17,940 |
| Gary Lindstrom | CM Life | 6238514 | $2 million | $24,576 |
| Flintie Williams | CM Life | 6238476 | $1.2 million | $8,742 |
| *Total* | | | *$10 million* | *$85,944* |

30.    The loan was structured with Plaintiff RLW as the borrower; the actual ownership interest in the South Market was to be held by the related entity, Plaintiff RLLW.  Each member of the South Market Group signed personal guarantees for the loan.  The South Market Group members also assigned their interest in the life insurance policies to AI Credit as security for the loans.  True and correct copies of the Promissory Note executed by RLW, along with the Assignment of Life Insurance Policies, are attached to Plaintiffs' First Amended Complaint as Exhibit "1," and incorporated herein by reference.  These documents were prepared by AI Credit, and provided to the South Market Group members for signature by Movsesian.

31.    The Promissory Note did not restrict the use of the loan proceeds.  At all times material to this action, it was clear to all parties, including Movsesian, AI Credit, and CM Life, that the South Market Group would use the

loan proceeds to make their equity investment in the South Market. For example, in an October 3, 1997 letter from Kevin Ferguson of AI Credit to Plaintiff Jackie Robinson, AI Credit confirmed that the loan had been approved and that the purpose of the loan was to fund the purchase of the South Market (a true and correct copy of this letter is attached hereto to Plaintiffs' First Amended Complaint as Exhibit "2," and incorporated herein by reference). Similarly, in making the initial interest payment on the loan (interest payments were due in advance under the Promissory Note), RLW's check to AI Credit at or about the time the loan funded stated that the purpose of the check and payment was: "INTEREST ON PIZZA HUT EQUITY LOAN" (a true and correct copy of this check is attached to Plaintiffs' First Amended Complaint as Exhibit "3," and incorporated herein by reference).

32.    At or about the time that RLW received the loan, Defendants AI Credit and CM Life reaffirmed Movsesian's status as their agent, and ratified his conduct. This is evidenced by numerous facts and communications including, but not limited to, the following: Movsesian delivered the life insurance and loan applications for AI Credit and CM Life; Movsesian collected the premiums for CM Life and interest payments for AI Credit; CMSI funded the loan; and AI Credit confirmed that Plaintiffs should contact Movsesian with regard to any questions about the loan.

33.    The face amounts of the life insurance policies issued by CM Life were much larger than necessary to secure the loan from AI Credit. As a result, the South Market Group's annual premiums of $85,944 were greatly in excess of what they should have been. In fact, to date the South Market Group has paid in excess of approximately $500,000 in premiums to CM Life. Plaintiffs are informed and believe and thereon allege that Movsesian, as CM Life's agent, was paid large commissions based upon these premiums for the sale of the life insurance to the South Market Group.

**Defendants Perpetrate The Deceptive Scheme On**

**Plaintiffs Moos and Theus**

34.     Pizza Hut subsequently advised RLLW that it was interested in selling the Pizza Hut Franchise for the North San Diego County Market ("North Market"). Pizza Hut approached RLLW because, as before, it was interested in selling to a minority-owned business. Pizza Hut required RLLW to make an equity contribution of approximately $2.2 million, or about 20% of the $11 million purchase price for the North Market.

35.     Movsesian, acting under the direction and with the approval of the other Defendants, advised RLLW that he could arrange low interest loans to fund the required equity contribution. However, Plaintiffs are informed and believe, and on that basis allege, that in order for Movsesian to sell more life insurance – both for his own benefit and the benefit of the other Defendants -- Movsesian advised RLLW that it would have to bring in additional investors to obtain the loan.

36.     RLLW subsequently brought in two new investors, Plaintiffs Moos and Theus. Movsesian, acting for himself and on behalf of the other Defendants, and under the direction and with the approval of the other Defendants, made substantially the same fraudulent misrepresentations to Plaintiffs Moos and Theus as he had made to RLLW, RLW, and the South Market Group. These are alleged above, and in particular in paragraphs 18 through 22, and paragraph 26.

37.     Moos and Theus accepted the Defendants' offer to provide them loans to purchase an interest in RLLW, and to facilitate the acquisition of the North Market. Moos and Theus also agreed to surrender their existing life insurance policies, and replace them with far larger and more expensive life insurance policies issued by Defendants Mass Mutual and American General. In doing so, Moos and Theus, being ignorant of the true facts, reasonably relied

14

upon the following: (i) the fraudulent misrepresentations alleged above; (ii) the apparent prior success the South Market Group had experienced with the CMS Program, AI Credit, Movsesian, and the insurers he represented; and (iii) Movsesian's claim, made at the direction and with the approval of the other Defendants, that he and the other Defendants were "experts" in insurance, finance, and "leveraged" borrowing programs.

38.   Shortly before the North Market purchase closed, Pizza Hut raised the purchase price to $14 million, thus requiring $2.8 million in equity, rather than the original $2.2 million.

39.   Movsesian arranged a $2.45 million loan from AI Credit to Moos, and a $400,000 loan from AI Credit to Theus.  At the same time, Movsesian also arranged for the issuance of life insurance policies covering Moos and Theus. According to Movsesian, this insurance was an integral part of the loan funding mechanism.  The life insurance polices were issued by Defendants Mass Mutual and American General with the following face amounts and annual premiums:

| Insured | Insurer | Policy Number | Policy Face Value | Annual Premium |
|---|---|---|---|---|
| Rick Moos | Mass Mutual | 11542384 | $3.35 million | $112,141 |
| | Amer. General | U10002655L | $3 million | $117,000 |
| Reggie Theus | Mass Mutual | 11532525 | $3.5 million | $53,766 |
| *Total* | | | *$9.85 million* | *$282,907* |

40.   At this point, Movsesian dropped a "bombshell" on Plaintiffs RLLW, RLW, the South Market Group, Moos, and Theus.  Movsesian insisted that he receive an extra $50,000 from Plaintiffs – on top of the lucrative commissions he was already expected to earn from the transaction -- before he would complete the loan transactions necessary for the acquisition of the North

Market. Movsesian made this demand even though: (i) Moos and Theus had already signed Promissory Notes and Assignment of Life Insurance documents for the loans; (ii) Plaintiffs had already signed an agreement with Pizza Hut to purchase the North Market; and (iii) it was too late for Plaintiffs to arrange alternative financing.

41.    Faced with the loss of the North Market, breach of the agreement with Pizza Hut and a potential lawsuit by Pizza Hut as a result of that breach, as well as damage to their overall relationship with Pizza Hut, Plaintiffs were under severe economic duress. They therefore had no choice but to accept Movsesian's demand. In March 1998 RLLW paid Movsesian the $50,000 as a "fee for management services." Only then did Movsesian consummate the loan transactions and fund the loans from AI Credit to Moos and Theus.

42.    Moos and Theus signed personal guarantees for the loans. They also assigned their interest in the life insurance policies to AI Credit as security for the loans. True and correct copies of the Promissory Note, Personal Guarantee, and Assignment of Life Insurance Policies executed by Moos are attached to Plaintiffs' First Amended Complaint as Exhibit "4," and incorporated herein by reference. The Promissory Note, Personal Guarantee, and Assignment of Life Insurance Policies executed by Theus were substantially similar to those executed by Moos. These documents were prepared by AI Credit, and provided to Moos and Theus for signature by Movsesian.

43.    The Promissory Notes executed by Moos and Theus did not restrict the use of the loan proceeds. At all times material to this action, it was clear to all parties -- including Movsesian, AI Credit, American General, and Mass Mutual -- that Moos and Theus would use the loan proceeds to fund their investment in RLLW and facilitate the purchase of the North Market.

44.    At or about the time that Moos and Theus received the loans, AI Credit, Mass Mutual, and American General reaffirmed Movsesian's status as

1   their agent, and ratified his conduct. This is evidenced by numerous facts and

2   communications including, but not limited to, the following: Movsesian

3   delivered the life insurance and loan applications for AI Credit, Mass Mutual,

4   and American General; Movsesian collected the premiums for Mass Mutual and

5   American General and interest payments for AI Credit; and CMSI funded the

6   loan.

7          45.    The face amounts of the life insurance policies issued by Mass

8   Mutual and American General were much larger than necessary to secure the

9   loans from AI Credit. As a result, Moos and Theus' annual premiums of

10  $282,907 were greatly in excess of what they should have been. In fact, to date

11  RLLW, on behalf of Moos and Theus, has paid in excess of approximately $1

12  million in premiums to Mass Mutual and American General. Plaintiffs are

13  informed and believe and on that basis allege that Movsesian, as Mass Mutual

14  and American General's agent, was paid large commissions based upon these

15  premiums for the sale of the life insurance to Moos and Theus.

16  **Defendants Perpetrate The Deceptive Scheme On Plaintiff Greenwood**

17         46.    In 1999 RLLW was again presented with a business opportunity by

18  Pizza Hut, and began negotiating for the purchase of Pizza Hut's Iowa Franchise

19  ("Iowa Market"). Movsesian, with the approval and under the direction of the

20  other Defendants, again approached RLLW, and said that he could arrange a low

21  interest loan to fund the required equity contribution. Plaintiffs initially told

22  Movsesian they were not interested, and did not want him involved in the

23  transaction because of the $50,000 "fee for management services" he insisted

24  that they pay to consummate the Moos and Theus loan transactions. Movsesian

25  said that he would "make it up" to Plaintiffs on subsequent transactions by (i)

26  giving them value in the transactions equivalent to the $50,000 payment, and (ii)

27  other preferential loan terms. Based on these new promises related to the

28  payment of the "fee for management" services, Plaintiffs agreed to involve

1   Movsesian in a new loan transaction.  However, Movsesian again stated that
2   RLLW would have to bring in additional investors to obtain the loan.  These
3   new investors included plaintiff Greenwood.

4       47.  Movsesian, acting for himself and on behalf of the other
5   Defendants, and with the approval and under the direction of the other
6   Defendants, made substantially the same fraudulent misrepresentations to
7   Plaintiff Greenwood as he had made to RLLW, RLW, the South Market Group,
8   Moos, and Theus.  These are alleged above, and in particular in paragraphs 18
9   through 22, and paragraph 26.

10       48.  Greenwood accepted the Defendants' offer to provide a loan to
11   purchase an interest in RLLW, which RLLW planned to use to facilitate the
12   acquisition of the Iowa Market.  In doing so, Greenwood, being ignorant of the
13   true facts, reasonably relied upon the following: (i) the fraudulent
14   misrepresentations alleged above; (ii) the apparent prior success the South
15   Market Group had experienced with the CMS Program, AI Credit, Movsesian,
16   and the insurers he represented; and (iii) Movsesian's claim, made at the
17   direction and with the approval of the other Defendants, that he and the other
18   Defendants were "experts" in insurance, finance, and "leveraged" borrowing
19   programs.

20       49.  Movsesian thereafter fund a $250,000 loan from AI Credit to
21   Greenwood.  At the same time, Movsesian also arranged for the issuance of a
22   life insurance policy covering Greenwood.  According to Movsesian, this
23   insurance was an integral part of the loan funding mechanism.  The life
24   insurance policy issued by Mass Mutual with the following face amount and
25   annual premium:

26

27

28

| Insured | Insurer | Policy Number | Policy Face Value | Annual Premium |
|---------|---------|---------------|-------------------|----------------|
| David Greenwood | Mass Mutual | 11569807 | $1.5 million | $23,660 |

50.    Movsesian, under the direction, and/or with the approval of AI Credit, represented to Greenwood that the Promissory Note for the loan was identical to those signed by the members of the South Market Group and Plaintiffs Moos and Theus.  Relying on that representation, and on the Defendants' claimed expertise in insurance, finance, and "leveraged" borrowing programs, Greenwood signed the Promissory Note without meaningful review, and without comparing it to the Promissory Notes signed by the other Plaintiffs.

51.    Greenwood also assigned his interest in the life insurance policy to AI Credit as security for the loan.  Copies of the Promissory Note and Assignment of Life Insurance Policy executed by Greenwood are attached as exhibits to the complaint in the action subsequently filed by AI Credit against Greenwood in the Central District of California, styled *A.I. Credit Consumer Discount Co. v. Greenwood, et al.*, Case No. CV-03-2564-RMT, and are incorporated herein by reference.  These documents were prepared by AI Credit, and provided to Greenwood for signature by Movsesian.

52.    At or about the time Greenwood received the loan, AI Credit and Mass Mutual reaffirmed Movsesian's status as their agent, and ratified his conduct.  This is evidenced by numerous facts and communications including, but not limited to, the following: Movsesian delivered the life insurance and loan applications for AI Credit, and Mass Mutual; Movsesian collected the premiums for Mass Mutual and interest payments for AI Credit; and CMSI funded the loan.

53.    Unbeknownst to Greenwood and the other Plaintiffs, the Promissory Note provided by AI Credit through Movsesian was not, in fact,

1   identical to the Promissory Notes previously executed by the other Plaintiffs. AI
2   Credit made certain changes to the language of the Greenwood Promissory Note
3   without notifying Greenwood or the other Plaintiffs. Based on the Promissory
4   Note, AI Credit has filed an action against Greenwood and his wife, Joyce
5   Greenwood, in the Central District of California styled *A.I. Credit Consumer*
6   *Discount Co. v. Greenwood, et al.*, Case No. CV-03-2564-RMT. In that action,
7   AI Credit contends that Greenwood was restricted to using the loan proceeds to
8   pay insurance premiums. AI Credit only made this claim after Greenwood
9   refused AI Credit's demands – where were made without any additional
10   consideration to Greenwood – for more collateral and a specific principal payoff
11   date. AI Credit makes these claims even though (i) the Promissory Note
12   specifically acknowledged that the loan proceeds were for "business purposes,"
13   and (ii) at all times material to this action, it was clear to all parties -- including
14   Movsesian, AI Credit, and Mass Mutual -- that Greenwood would use the loan
15   proceeds to fund his investment in RLLW and facilitate the purchase of the Iowa
16   Market.

17          54.     The face amount of the life insurance policy issued by Mass Mutual
18   was much larger than what was needed to secure the loan from AI Credit.
19   Greenwood's annual insurance premium of $23,660 was excessive. In fact, to
20   date RLLW, on behalf of Greenwood, has paid in excess of approximately
21   $150,000 in premiums to Mass Mutual. Plaintiffs are informed and believe and
22   thereon allege that Movsesian, as Mass Mutual's agent, was paid large
23   commissions based upon these premiums for the sale of the life insurance to
24   Greenwood. Moreover, as part of the Greenwood loan transaction Movsesian
25   never gave $50,000 in equivalent value to Plaintiffs, nor did he provide any
26   preferential loan terms to Plaintiffs.

27
28

**Defendants Perpetrate The Deceptive Scheme On Plaintiff Parker**

55.     In the fall of 1999, Plaintiff Clark Parker was offered the opportunity to buy out the interest of one of the members of RLLW, and to thereby purchase an interest in the South and North Markets.

56.     Movsesian, acting for himself and on behalf of the other Defendants, made substantially the same fraudulent misrepresentations to Plaintiff Parker as he had made to RLLW, RLW, the South Market Group, Moos, Theus, and Greenwood. These are alleged above, and in particular in paragraphs 18 through 22, and paragraph 26. At this time, he again promised to "make good" on the $50,000 "fee for management services" by (i) giving Plaintiffs value in the transaction equivalent to the $50,000 payment, and (ii) other preferential loan terms.

57.     Parker accepted the Defendants' offer to provide a loan to purchase an interest in RLLW, and a share of the North and South Markets. In doing so, Parker, being ignorant of the true facts, reasonably relied upon the following: (i) the fraudulent misrepresentations alleged above; (ii) the apparent prior success RLLW had experienced with the CMS Program, AI Credit, Movsesian, and the insurers he represented; and (iii) Movsesian's claim, made with the approval and under the direction of the other Defendants, that he and the other Defendants were "experts" in insurance, finance, and "leveraged" borrowing programs.

58.     Movsesian thereafter funded a $2.1 million loan from AI Credit to Parker. At the same time, Movsesian also arranged for the issuance of a life insurance policy covering Parker. According to Movsesian, this insurance was an integral part of the loan funding mechanism. The life insurance policy issued by Mass Mutual with the following face amount and annual premium:

| Insured | Insurer | Policy Number | Policy Face Value | Annual Premium |
|---------|---------|---------------|-------------------|----------------|
| Clark Parker | Mass Mutual | 11037083 | $6 million | $199,610 |

59.     Movsesian, at the direction and with the approval of AI Credit, represented to Parker that the Promissory Note for the loan was identical to those signed by the members of the South Market Group, Moos, and Theus. Relying on that representation, and on the Defendants' claimed expertise in insurance, finance, and "leveraged" borrowing programs, Parker signed the Promissory Note without meaningful review, and without comparing it to the Promissory Notes signed by the other Plaintiffs.

60.     Parker also assigned his interest in the life insurance policy to AI Credit as security for the loan.  Copies of the Promissory Note and Assignment of Life Insurance Policy executed by Parker are attached to the complaint in the action subsequently filed by AI Credit against Parker in the Central District of California, styled *A.I. Credit Consumer Discount Co. v. Parker*, Case No. CV-03-2563-TJH, and are incorporated herein by reference.  These documents were prepared by AI Credit, and provided to Parker for signature by Movsesian.

61.     At or about the time Parker received the loan, AI Credit and Mass Mutual reaffirmed Movsesian's status as their agent, and ratified his conduct. This is evidenced by numerous facts and communications including, but not limited to, the following: Movsesian delivered the life insurance and loan applications for AI Credit, and Mass Mutual; Movsesian collected the premiums for Mass Mutual and interest payments for AI Credit; and CMSI funded the loan.

62.     Unbeknownst to Parker and the other Plaintiffs, the Promissory Note provided by AI Credit through Movsesian was not, in fact, identical to the Promissory Notes previously executed by the other Plaintiffs.  AI Credit made certain changes to the language of the Parker Promissory Note without notifying Parker or the other Plaintiffs.  Based on the Promissory Note, AI Credit has filed an action against Parker, in the Central District of California styled *A.I. Credit Consumer Discount Co. v. Parker.*, Case No. CV-03-2563-TJH.  In that action,

1   AI Credit contends that Parker was restricted to using the loan proceeds to pay

2   insurance premiums.  AI Credit only made this claim after Parker refused AI

3   Credit's demands – where were made without any additional consideration to

4   Parker – for more collateral and a specific principal payoff date.  AI Credit

5   makes this claim even though (i) the Promissory Note specifically

6   acknowledged that the loan proceeds would be used for "business purposes,"

7   and (ii) at all times material to this action, it was clear to all parties -- including

8   Movsesian, AI Credit, and Mass Mutual -- that Parker would use the loan

9   proceeds to fund his investment in RLLW.

10       63.    The face amount of the life insurance policy issued by Mass Mutual

11   was much larger than what was needed to secure the loan from AI Credit.

12   Parker's annual insurance premium of $199,610 was excessive.  In fact, to date

13   RLLW, on behalf of Parker, has paid in excess of $1 million to Mass Mutual.

14   Plaintiffs are informed and believe and thereon allege that Movsesian, as Mass

15   Mutual's agent, was paid large commissions based upon these premiums for the

16   sale of the life insurance to Parker.  Moreover, as part of the Parker loan

17   transaction Movsesian never gave $50,000 in equivalent value to Plaintiffs, nor

18   did he provide any preferential terms to Plaintiffs.

19   **Plaintiffs Experience Severe Financial Pressure From the Combined Effects**

20   **of the Interest Payments and the Exorbitant Insurance Premiums,**

21   **Culminating In the Loss of the North and South Markets**

22       64.    As alleged above, the effect of the Defendants scheme was to

23   impose a crushing financial burden on the Plaintiffs through the combined

24   effects of the nearly $700,000 in annual insurance premiums, and the interest

25   payments on the AI Credit loans.

26       65.    In July 2001, Plaintiffs learned for the first time that the net cash

27   surrender values of the insurance policies were substantially less than previously

28   represented by the Defendants.

66.    In the fall of 2001, Plaintiffs learned for the first time that there were – and had been at the time of the original transactions -- life insurance policies available on the market with the same face value as the policies issued by the Defendants, but with substantially lower premiums.  Plaintiffs thereafter contacted Movsesian and proposed that Plaintiffs "roll over" their current life insurance policies into policies with lower premiums.  Movsesian told Plaintiffs that the policies could not be changed under any circumstances, that neither AI Credit nor the Defendant insurers would consent to such a transaction, and that Plaintiffs should not contact AI Credit or the insurers directly.

67.    Faced with mounting financial pressures, Plaintiffs directly contacted AI Credit over Movsesian's objections.  After extensive negotiations throughout the first half of 2002, AIG and AI Credit agreed that Plaintiffs could replace the insurance policies issued by the Defendants with much less expensive policies issued by Pacific Life Insurance Company.  By these agreements, AI Credit admitted that the policies issued to the Plaintiffs by the Defendant insurers were excessive.

68.    At the same time, Defendants conspired to make another grab for Plaintiffs' money.  At the time the original policies were rolled into the Pacific Life policies, Plaintiffs instructed the Defendant insurers to transfer into the Pacific Life policies the several hundred thousand dollars of cash values then existing in the original policies.  The Defendant insurers insisted instead that the cash values be paid to AI Credit, despite no legal or contractual basis for such a demand.  After holding Plaintiffs' money hostage for several months, the Defendant insurers withdrew their demand and transferred the cash values as instructed by Plaintiffs.

69.    Beginning in April 2002, AIG and AI Credit for the first time contended that the Plaintiffs had improperly used the loan proceeds to fund the Pizza Hut investments, and that the loans should only have been used to pay

premiums on insurance policies.  AIG and AI Credit made this claim in spite of the fact that the Defendants knew the sole purpose of the loans was for the Pizza Hut investments, as alleged in detail above.  AIG and AI Credit have, contrary to the terms of the Promissory Notes and in breach of the implied covenant of good faith and fair dealing, demanded that the Plaintiffs provide additional collateral for the loans.  AIG and AI Credit have in bad faith: (i) asserted that the loan proceeds could not be used for business purposes despite language to the contrary contained in the promissory notes and despite actual knowledge of Plaintiffs' intended use of the loan proceeds; (ii) demanded various changes in the terms of the loans -- including additional collateral and a specific principle pay-off date -- without a basis under the loan agreements, and without additional consideration; (iii) threatened to institute, and have instituted, baseless litigation -- including claims of fraud -- against Plaintiffs when they failed to comply with AI Credit's improper demands; (iv) instituted legal proceedings asserting that Plaintiffs failed to pay insurance premiums, constituting a default under the loan documents, when Defendant AI Credit was aware of and authorized payment of Plaintiffs' insurance premium payments from the cash value of Plaintiffs' insurance policies; (v) improperly claimed that Plaintiffs are in default on the loan agreements; (vi) accelerated repayment of the loans based on non-material breaches of the loan agreements; (vii) attempted to lure Plaintiffs into defaulting on their interest payment obligations by refusing to provide Plaintiffs with invoices for interest due on the loans, despite Plaintiffs requests for such statements and despite Defendant AI Credit's obligation to provide such statements under the terms of the Promissory Notes; (viii) refused Plaintiffs' tender of hundreds of thousands of dollars in interest payments and refused to explain the basis for such refusal despite numerous requests by Plaintiffs; and (ix) instituted legal proceedings asserting that Plaintiffs failed to pay interest payments.

70.   As of December 2003, Plaintiffs have paid interest payments on the AI Credit loans of approximately $1.7 million, and insurance premium payments of approximately $2.5 million.

71.   As a direct and proximate result of the crushing financial burden imposed upon Plaintiffs as a result of Defendants fraudulent schemes and bad faith, the financial pressures on Plaintiffs became so acute that in July 2004, they were forced to sell the North and South Markets to Pizza Hut, Inc., at loss in excess of $50 million.

## FIRST CLAIM FOR RELIEF

### FRAUD AND DECEIT

### (Against All Defendants)

72.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 71 above.

73.   Defendants made numerous false, fraudulent, and misleading representations to Plaintiffs as alleged in detail above, and in particular in paragraphs 16, 17, 18, 19a-g, 20, 21, 22, 26, 27, 29, 35, 36, 39, 46, 49, 50, 53, 56, 58, 59, and 62.

74.   As alleged in detail above, Defendants representations were false, and Defendants knew them to be false at the time they were made.

75.   Moreover, at the time that it entered into the loan transactions with Plaintiffs, Defendant AI Credit made written promises to Plaintiffs, contained in the Promissory Notes and Assignment of Life Insurance Policies prepared by AI Credit and executed by Plaintiffs, that it would loan funds to Plaintiffs under the terms as set forth in the Promissory Notes and Assignment documents.  By issuing the Promissory Notes and Assignment documents, Defendant AI Credit indicated its willingness to perform its promises to loan Plaintiffs funds pursuant to the terms of the Promissory Notes and Assignment documents.

76.     The promises made by Defendants AI Credit to loan funds to Plaintiffs under the terms of the Promissory Notes and Assignment documents were false, and Defendant AI Credit knew them to be false at the time they were made, in that at the time AI Credit prepared the Promissory Notes and Assignment documents, and Plaintiffs executed the Promissory Notes and Assignment documents, Defendant AI Credit had no intention of performing the promises contained in the Promissory notes.

77.     As alleged in detail above, the false, fraudulent and misleading representations and false promises made by the Defendants were made with the intent to deceive Plaintiffs, and to induce them to enter into various loans transactions secured by life insurance policies with excessively large face amounts and exorbitant annual premiums.

78.     As alleged in detail above, Plaintiffs were ignorant of the falsity of the representations and promises made by Defendants, and believing them to be true, reasonably relied upon such representations and promises by entering into the Promissory Notes for the loans, and purchasing from the insurer Defendants life insurance policies with excessively high face amounts and exorbitant annual premiums.

79.     As a result of Defendants' false, fraudulent and misleading representations and false promises, Plaintiffs have been damaged in an amount no less than $500 million (including, but not limited to, interest and insurance payments, corporate and personal tax liabilities, anxiety, worry, mental and emotional distress, severe financial distress – including the loss of the North and South Markets -- and other compensatory, consequential, and incidental damages), with the exact amount of damages to be proven at the time of trial.

80.     The statements and conduct by Defendants, and each of them, were made and undertaken with an evil motive and malice, willfully and wrongfully, with the intent to filch money from Plaintiffs, and with a conscious disregard for

the deceptiveness of their conduct and statements and the rights of Plaintiffs. Such statements and conduct were intended to deceive Plaintiffs and were despicable and carried on by Defendants, and each of them, with willful and conscious disregard for the rights of Plaintiffs. Defendants, and each of them, are therefore guilty of malice, oppression and fraud as defined in California Civil Code § 3294. Plaintiffs are informed and believe, and on that basis alleged, that such acts of malice, oppression and fraud on the part of Defendants, and each of them, were committed by officers, directors or managing agents of Defendants, and each of them, and/or that such wrongful acts were committed with the consent, approval and/or ratification of an officer, director and/or managing agents of Defendants, and each of them. Accordingly, Plaintiffs are entitled to recover punitive damages from Defendants, and each of them, pursuant to California Civil Code § 3294.

**SECOND CLAIM FOR RELIEF**

**PROFESSIONAL NEGLIGENCE**

**(Against Defendants Movsesian, CMSI, AIG, American General, CM Life, and Mass Mutual)**

81.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 80 above.

82.    As alleged in detail above, and in particular in paragraphs 16, 18, 19b, 19f, 26, 27, 29, 36, 37, 39, 47, 48, 49, 50, 56, 57, 58, and 59, Defendant Movsesian held himself out to be an "expert" in the fields of insurance, financing, and unique "leveraged" borrowing programs. Similarly, Defendants AIG, American General, CM Life, and Mass Mutual held themselves out, individually and through Movsesian, to be "elite" life insurance companies with superior knowledge and expertise in structuring and participating in "leveraged" loan programs for investment purposes, and in recommending and placing suitable life insurance as security for the loans.

83.     Defendants Movsesian, AIG, American General, CM Life, and Mass Mutual therefore had a duty to exercise the skill, prudence, knowledge, care, and diligence ordinarily used by life insurance professionals and life insurance companies in recommending life insurance programs suitable for the objectives of the policyholder.

84.     Defendants Movsesian, AIG, American General, CM Life, and Mass Mutual breached their duties of care by, among other things:

      a.    Improperly recommending and placing life insurance policies that were wholly unsuitable for the Plaintiffs, and wholly unsuitable for the objective of obtaining the loans Plaintiffs sought.

      b.    Improperly recommending and placing life insurance policies with much higher face values, and with much higher annual premiums, than necessary to obtain the loans Plaintiffs sought.

      c.    Improperly "churning" Plaintiffs' existing life insurance policies.

      d.    Improperly representing that the cash values of the life insurance policies would accumulate in amounts sufficient to pay down the loan principles within 10 years.

      e.    Improperly representing that the insurance premiums were tax deductible.

85.     As a proximate result of the breaches of duty by Defendants Movsesian, AIG, American General, CM Life, and Mass Mutual, Plaintiffs have been damaged in an amount in an amount no less than $500 million, with the exact amount of damages to be proven at the time of trial.

### THIRD CLAIM FOR RELIEF

### NEGLIGENT HIRING, TRAINING, AND SUPERVISION

### (Against Defendants AIG, AI Credit, American General,

### CM Life, and Mass Mutual)

86.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 85 above.

87.     As alleged in detail above, Movsesian was the agent of Defendants AIG, AI Credit, American General, CM Life, and Mass Mutual.  In retaining Movsesian as their agent, Defendants AIG, AI Credit, American General, CM Life and Mass Mutual had the duty to exercise reasonable skill, care, knowledge, prudence, and diligence in (i) hiring Movsesian; (ii) training him to be Defendants' agent, including but not limited to training him to be fully familiar with the standards, practices, programs, laws, regulations, and duties relevant to Movsesian's position as Defendants' agent; and (iii) appropriately supervising Movsesian as Defendants' agent.

88.     Defendants AIG, AI Credit, American General, CM Life, and Mass Mutual breached their duties of care regarding Movsesian's hiring, training, and supervision, by, among other things:

      a.    Retaining Movsesian as their agent, even though the California Department of Insurance revoked Movsesian's license to sell insurance in 1984, and the Department did not fully reinstate the license until 1995.

      b.    Failing to train Movsesian properly regarding the standards, practices, programs, laws, regulations, and duties relevant to Movsesian's position as Defendants' agent, including failing to properly train him regarding the CMS Program.

      c.    Failing to appropriately supervise Movsesian, thereby permitting Movsesian to make the numerous false,

fraudulent, and misleading representations alleged in detail
above, and in particular in paragraphs 16, 17, 18, 19a-g, 20,
21, 22, 26, 27, 29, 35, 36, 39, 46, 49, 50, 53, 56, 58, 59, and
62; and/or directing him to make those false, fraudulent, and
misleading representations; and/or ratifying Movsesian's
conduct.

89.    As a proximate result of the breaches of duty by Defendants AIG,
AI Credit, American General, CM Life, and Mass Mutual, Plaintiffs have been
damaged in an amount no less than $500 million, with the exact amount of
damages to be proven at the time of trial.

## FOURTH CLAIM FOR RELIEF
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (Against Defendant AI Credit)

90.    Plaintiffs re-allege and incorporate by reference as if fully set forth
herein the allegations of paragraphs 1 through 89 above.

91.    The Promissory Notes, Assignments of Life Insurance Policies, and
other loan documents prepared by AI Credit and executed by Plaintiffs
contained an implied covenant of good faith and fair dealing.  Therefore, AI
Credit owed to Plaintiffs a duty of good faith and fair dealing with respect to all
dealings, transactions, and relationships arising under the Promissory Notes,
Assignments of Life Insurance Policies, and other loan documents.

92.    Plaintiffs have performed and satisfied all obligations and
conditions to be performed by them under the Promissory Notes, Assignment of
Life Insurance Policies, and other loan documents, except those obligations and
conditions excused by the conduct, acts or failures to act of AI Credit.

93.     Defendant AI Credit breached its duty of good faith and fair dealing owed to Plaintiffs by the various improper acts alleged in detail above including, but not limited to:

    a.    Asserting that the loan proceeds could not be used for business purposes despite language to the contrary contained in the promissory notes and despite actual knowledge of Plaintiffs' intended use of the loan proceeds;

    b.    Demanding various changes in the terms of the loans - including additional collateral and a specific principle pay-off date - without a basis under the loan agreements, and without additional consideration;

    c.    Threatening to institute, and instituting, baseless litigation - including claims of fraud against Plaintiffs when they failed to comply with AI Credit's improper demands;

    d.    Instituting legal proceedings asserting that Plaintiffs failed to pay insurance premiums, constituting a default under the loan documents, when Defendant AI Credit was aware of and authorized payment of Plaintiffs' insurance premium payments from the cash value of Plaintiffs' insurance policies;

    e.    Improperly claiming that Plaintiffs are in default on the loan agreements;

    f.    Accelerating repayment of the loans based on non-material breaches of the loan agreements;

    g.    Attempting to lure Plaintiffs into defaulting on their interest payment obligations by refusing to provide Plaintiffs with invoices for interest due on the loans, despite Plaintiffs requests for such statements and despite Defendant AI

Credit's obligation to provide such statements under the
terms of the Promissory Notes;

h.    Refusing Plaintiffs' tender of hundreds of thousands of
dollars in interest payments and refusing to explain the basis
for such refusal despite numerous requests by Plaintiffs; and

i.    Instituting legal proceedings asserting that Plaintiffs failed to
pay interest payments.

94.    As a proximate result of Defendant AI Credit's breach of the
implied covenant of good faith and fair dealing, Plaintiffs have suffered anxiety,
worry, mental and emotional distress, severe financial hardship – including the
loss of the North and South Markets -- and have been forced to incur substantial
attorneys fees and costs to defend themselves against the litigation and threats of
litigation by AI Credit, and have suffered other compensatory, consequential,
and incidental damages, in an amount no less than $500 million, with the exact
amount of damages to be proven at the time of trial.

95.    The statements and conduct by AI Credit were made and
undertaken with an evil motive and malice, willfully and wrongfully, and with a
conscious disregard for the rights of Plaintiffs. Such statements and conduct
were despicable and carried on by AI Credit with willful and conscious
disregard for the rights of Plaintiffs. AI Credit is therefore guilty of malice,
oppression and fraud as defined in California Civil Code § 3294. Plaintiffs are
informed and believe, and on that basis alleged, that such acts of malice,
oppression and fraud on the part of AI Credit were committed by officers,
directors or managing agents of AI Credit, and/or that such wrongful acts were
committed with the consent, approval and/or ratification of an officer, director
and/or managing agents of AI Credit and/or AIG. Accordingly, Plaintiffs are
entitled to recover punitive damages from AI Credit and AIG, and each of them,
pursuant to California Civil Code § 3294.

# FIFTH CLAIM FOR RELIEF

## REFORMATION

### (By Plaintiffs Greenwood and Parker Against Defendant AI Credit)

96.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 95 above.

97.     As alleged above in detail, and in particular at paragraphs 46 through 63, it was agreed and understood by Plaintiffs on the one hand, and Defendants Movsesian, AI Credit, and Mass Mutual on the other, that the terms of loans to Plaintiffs Greenwood and Parker would be the same as those for the loans to the other Plaintiffs, that the terms of the Promissory Notes for the loans would be identical, and that in particular that the loans were expressly to be used for the Pizza Hut investments.

98.     At the time Movsesian, as AI Credit's agent, presented the Promissory Notes prepared by AI Credit to Greenwood and Parker for signature, he represented that the Promissory Notes were identical to those signed by the other Plaintiffs, and that the loans could be used for the Pizza Hut investment. At that time, Movsesian knew those representations to be false, in that unbeknownst to Greenwood and Parker, AI Credit made certain changes to the language of the Promissory Notes. These representations were intentionally made so as to induce Plaintiffs Greenwood and Parker to sign the Promissory Notes, and complete the loan transactions. Justifiably relying on these false, fraudulent, and misleading representations, Plaintiffs Greenwood and Parker signed the Promissory Notes.

99.     Defendant AI Credit now contends that, based on the language of the Promissory Notes, Greenwood and Parker were restricted to using the loan proceeds to pay insurance premiums. As alleged in detail above, AI Credit has filed actions against Greenwood, Parker, and others based on this contention.

100.   Plaintiffs Greenwood and Parker are now entitled to reformation of the Promissory Notes, and a revision of the language of the Promissory Notes to reflect the true intention of the parties: (i) that the language of the Promissory Notes signed by Greenwood and Parker conform to the language of the Promissory Notes signed by the other Plaintiffs, and (ii) that the loans could be used for the Pizza Hut investment.

### SIXTH CLAIM FOR RELIEF

### RESCISSION

### (By Plaintiff RLLW Against Defendants Movsesian and CMSI)

101.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 100 above.

102.   As alleged in detail above, and in particular in paragraphs 40, 41, 46, 54, 56, and 63, Plaintiff RLLW paid to Defendant Movsesian a "fee for management services" of $50,000.  The agreements related to this "fee for management services" were partially reduced to writing, as evidenced by the documents attached to Plaintiffs' First Amended Complaint as Exhibit "5," and incorporated herein by reference.

103.   Subsequently, as alleged in detail above, and in particular in paragraphs 46, 54, 56, and 63, Defendant Movsesian agreed to certain modifications to the agreements related to the "fee for management services," and promised to provide (i) value equivalent to $50,000 to Plaintiffs, and (ii) provide preferential loan terms on transactions subsequent to the payment of the $50,000.

104.   Defendant Movsesian breached the agreements related to the "fee for management services" within four years of the filing of the complaint in this action, in particular by failing to (i) provide $50,000 in equivalent value to Plaintiffs, and (ii) failing to provide preferential loan terms.

105.   Plaintiffs are now entitled to rescission of the agreement, as modified, related to the payment of the $50,000 "fee for management services," and restitution of the $50,000 from Movsesian because, as alleged in detail above, and in particular in paragraphs 40 and 41, Plaintiffs were under extreme economic duress, orchestrated by Movsesian, at the time they agreed to the $50,000 payment.

106.   Service of the First Amended Complaint upon Movsesian constituted notice of rescission pursuant to California Civil Code § 1691.

## SEVENTH CLAIM FOR RELIEF

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – 18 U.S.C § 1962(c)

### (Against All Defendants)

107.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations of paragraphs 1 through 106 above.

108.   This claim for relief arises under 18 U.S.C § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and seeks to recover actual and treble damages based upon Defendants' violations of 18 U.S.C. § 1962(c), as described more fully below.

109.   At all times material to this action, each of the Plaintiffs and each of the Defendants constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

110.   Defendants, and each of them, are engaged in interstate commerce and the acts alleged herein have a demonstrable effect on interstate commerce.

111.   18 U.S.C. § 1961(4) defines the term RICO "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

112.   At all times material to this action, pursuant to the numerous agreements, correspondence, and communications between the Defendants, the

direct parent-subsidiary relationships between Defendants AIG, AI Credit, and American General, the direct parent-subsidiary relationship between Defendants Mass Mutual and CM Life, and the agent-principal relationship between Defendant Movsesian and the other Defendants, an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) was formed between and among all Defendants. The enterprise operated through a decision-making structure involving executives and employees of each of the Defendants, with Movsesian operating as both the principle conduit for information and decisions between the other Defendants, and as the "front man" for the enterprise. Each of the Defendants exercised control and decision-making authority over the enterprise through this structure. The purpose of the association-in-fact enterprise was to commit numerous acts of racketeering activity, including mail and wire fraud as prohibited by 18 U.S.C. §§ 1341 and 1343. These acts of mail and wire fraud were committed in furtherance of Defendants wrongful schemes, as alleged in detail above, including but not limited to: (i) to induce Plaintiffs and others to purchase large amounts of unnecessary life insurance with grossly inflated face values and annual premiums, as a vehicle to secure large commercial loans, and so thereby to reap large commissions, fees, interest charges, and premium payments; (ii) to utilize Plaintiffs' money, in the form of insurance premiums, to gamble in the stock market and other investments while placing the burden and risk associated with those investment gambles on the Plaintiffs; and (iii) when Defendants determined that their investment gambles would not reap the returns they anticipated, resulting in policy cash values below that which Defendants deemed acceptable, employing improper and illegal demands, threats, and conduct to secure premature repayment of the loans.

113. Defendants have engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), by committing and/or aiding and abetting at least two such acts of racketeering activity within the last 10 years. Each such

1   act of racketeering activity was related, had similar purpose, involved the same

2   or similar participants and methods of commission, and had similar results

3   impacting upon similar victims, including Plaintiffs and others.

4       114.   The predicate acts of racketeering activity, as defined by 18 U.S.C.

5   § 1961(1)(B), consist of mail and wire fraud, as prohibited by 18 U.S.C. §§ 1341

6   and 1343, and in furtherance of Defendants wrongful and fraudulent schemes as

7   alleged in detail above. The predicate acts constituting mail and wire fraud

8   include, but are not limited to, correspondence sent through the mails and

9   facsimile transmissions through the telephone, as summarized in the chart

10   attached to Plaintiffs' First Amended Complaint as Exhibit "6," and

11   incorporated herein by reference.  Plaintiffs will contemporaneously lodge with

12   the Court an Appendix of Predicate RICO Acts, attaching each of the documents

13   constituting the predicate acts of mail and wire fraud summarized in Exhibit 6.

14   The substance of those documents is incorporated herein by reference.

15       115.   The Defendants, and each of them, engaged in and/or aided and

16   abetted these predicate acts of racketeering activity in violation of federal law.

17   These multiple acts of racketeering activity committed and/or aided and abetted

18   by Defendants, as described herein, were related to each other and amounted to

19   or posed a threat of continued racketeering activity, and therefore constitute a

20   "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

21       116.   In violation of 18 U.S.C. § 1962(c), each of the Defendants

22   conducted or participated, either directly or indirectly, in the conduct of the

23   enterprise's affairs through a pattern of racketeering activity, as alleged in detail

24   above.

25       117.   As a direct and proximate result of Defendants' violations of 18

26   U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, as

27   alleged in detail above.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled

28

to bring this action to recover actual and treble damages, the costs of bringing this action, and attorneys fees.

### EIGHTH CLAIM FOR RELIEF

### UNFAIR COMPETITION –

### CALIFORNIA BUS. & PROF. CODE §§ 17200, *et seq.*

### (Against All Defendants)

118.   Plaintiffs refer to and incorporate by this reference each and every allegation set forth above in paragraphs 1 through 117.

119.   By and through their conduct alleged in detail above, Defendant have engaged in activities which constitute fraudulent, unlawful, and unfair business acts and practices prohibited by California Business and Professions Code Section 17200, *et seq.*, including without limitation, the following:

    a.    Violations of California Finance Code § 22161, in that Movsesian, AI Credit and AIG have made statements and representations regarding the loans that were false, misleading, and deceptive, and that omitted material information necessary to make such statements not misleading, false or deceptive.

    b.    Violations of 18 USC § 1962, in that Defendants, as alleged in detail above, participated in a pattern of racketeering activity through the conduct of a RICO enterprise.

    c.    Numerous false, fraudulent, and misleading representations as alleged in detail above, and in particular in paragraphs 16, 17, 18, 19a-g, 20, 21, 22, 26, 27, 29, 35, 36, 39, 46, 49, 50, 53, 56, 58, 59, and 62.

    d.    Breach of the implied covenant of good faith and fair dealing, as alleged in detail above.

120.   The unlawful, fraudulent, deceptive, and unfair business practices of Defendants and each of them are ongoing and, unless enjoined under Business and Professions Code Section 17203, are likely to continue to harm and deceive other members of the general public, including individuals seeking loans from Movsesian, AI Credit, and AIG.

121.   Defendants, and each of them, have received unearned commercial benefits at the expense of Plaintiffs and the general public as a result of their employment of such unlawful, fraudulent, deceptive, and unfair business practices.

122.   In addition to being enjoined from continuing to use or employ their fraudulent, unlawful, and unfair business practices, Defendants, and each of them, must now, pursuant to Business and Professions Code Sections 17203, be compelled to make restitution to Plaintiffs and other members of the general public, and to restore to them all insurance premium payments, interest payments, and other sums paid to Defendants as a result of Defendants schemes.

123.   In prosecuting this action for enforcement of important rights affecting the public interest, Plaintiffs seek to recover their attorneys' fees under (a) the provisions of the Unfair Competition Act, (b) Section 1021.5 of the California Code of Civil Procedure, and/or (c) under the "common fund" doctrine available to a prevailing plaintiff who wins restitutionary damages for the general public.

WHEREFORE, Plaintiffs prays for judgment against Defendants, and each of them, as follows:

1.   For compensatory and other general damages including, but not limited to, interest and insurance payments, corporate and personal tax liabilities, anxiety, worry, mental and emotional distress, and severe financial hardship, in an amount no less than $500 million, with the exact amount to be proven at the time of trial;

2.   For other special, consequential, and incidental damages, in an amount to be proven at the time of trial;

3.   That Plaintiffs Greenwood and Parker are entitled to reformation of their Promissory Notes, and a revision of the language of the Promissory Notes to reflect the true intention of the parties, i.e., (i) that the language of the Promissory Notes signed by Greenwood and Parker conform to the language of the Promissory Notes signed by the other Plaintiffs, and (ii) that the loans could be used for the Pizza Hut investment;

4.   That Plaintiffs are now entitled to rescission of the agreement with Movsesian, as modified, related to the payment of the $50,000 "fee for management services," and restitution of the $50,000 from Movsesian;

5.   For actual damages, treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c);

6.   For restitution of all premium payments, interests payments, and other sums Plaintiffs and other members of the general public paid to Defendants as a result of Defendants fraudulent, unlawful, and unfair business practices, with the exact amount to be proven at the time of trial;

7.   That the Court issue a preliminary and a permanent injunction forbidding Defendants from continuing their fraudulent, unlawful and unfair business practices as alleged in detail above, and in particular the "CMS Program;"

8.   For recovery of Plaintiffs' reasonable attorneys' fees, including under (i) Section 1021.5 of the Code of Civil Procedure and/or (ii) the "common fund" doctrine available for a prevailing plaintiff who is awarded restitutionary damages for the general public;

9.  For prejudgment interest at the legal rate in an amount according to proof;

10. For exemplary and punitive damages in a sum according to proof at the time of trial, and in amounts sufficient to punish and deter the Defendants;

11. For costs of suit; and

12. For such other and further relief as the Court deems just and proper.

Dated: October 29, 2004          AYALA & ASSOCIATES
                                  DANIEL P. AYALA

                                  La BELLA & McNAMARA LLP
                                  CHARLES G. LA BELLA
                                  MATTHEW C. ELSTEIN

                                  By _____
                                       MATTHEW C. ELSTEIN
                                  Attorneys for Plaintiffs RLLW, INC.,
                                  RLW, INC., JACKIE ROBINSON,
                                  MICHAEL LOYD, FLINTIE
                                  WILLIAMS, RICK MOOS, REGGIE
                                  THEUS, DAVID K. GREENWOOD and
                                  CLARK PARKER

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims triable of right by jury.

Dated: October 29, 2004          AYALA & ASSOCIATES
                                  DANIEL P. AYALA

                                  La BELLA & McNAMARA LLP
                                  CHARLES G. LA BELLA
                                  MATTHEW C. ELSTEIN

                                  By _____
                                       MATTHEW C. ELSTEIN
                                  Attorneys for Plaintiffs RLLW, INC.,
                                  RLW, INC., JACKIE ROBINSON,
                                  MICHAEL LOYD, FLINTIE
                                  WILLIAMS, RICK MOOS, REGGIE
                                  THEUS, DAVID K. GREENWOOD and
                                  CLARK PARKER

David P. Ayala, Esq.
California Bar No. 174093
AYALA & ASSOCIATES
520 South Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 893-2015
Facsimile:  (702) 893-2042

Charles G. La Bella, Esq.
California Bar No. 183448
LA BELLA & MCNAMARA, LLP
401 West A Street, Suite 1150
San Diego, California 92101
Telephone: (619) 696-9200
Facsimile:  (619) 696-9269

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| RLLW, INC.; RLW, INC.; JACKIE ROBINSON, an individual; MICHAEL LOYD, an individual; FLINTIE WILLIAMS, an individual; RICK MOOS, an individual; REGGIE THEUS, an individual; DAVID K. GREENWOOD, an individual; and CLARK PARKER, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> JULIAN MOVSESIAN, an individual; CAPITAL MANAGEMENT STRATEGIES, INC.; AMERICAN INTERNATIONAL GROUP, INC.; MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY; C.M. LIFE INSURANCE COMPANY; AMERICAN GENERAL LIFE INSURANCE COMPANY, <br><br> Defendants. | Case No.: CV –03-4647 (TJH)(PJWx) <br><br><br><br><br> **DECLARATION OF SERVICE** |

I, the undersigned, declare as follows:

I am an employee of a member of the bar of this Court at whose direction the service was made in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is: 401 West "A" Street, Suite 1150, San Diego, California 92101.

1    On November 15, 2004, I served the following documents described as:

2    **SECOND AMENDED COMPLAINT FOR:  (1) FRAUD AND DECEIT; (2) PROFESSIONAL**

3    **NEGLIGENCE; (3) NEGLIGENT HIRING, TRAINING, AND SUPERVISION; (4) BREACH OF THE**

4    **IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; (5) REFORMATION;**

5    **(6) RESCISSION; (7) CIVIL RICO VIOLATIONS [18 U.S.C. § 1962(c)]; (8) UNFAIR COMPETITION**

6    **(CAL. BUS. & PROF. DOCE § 17200)**

7    by the following method:

8    \_\_\_\_\_  **MAIL** by causing a true copy thereof to be placed in a sealed envelope with postage thereon

9    fully prepaid to be placed in the United States mail at San Diego, California addressed as indicated

10   below. I am "readily familiar" with this firm's practice of collection and processing correspondence for

11   mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of

12   business.

13                              **SEE SERVICE LIST ATTACHED**

14   \_\_\_\_\_  **PERSONAL SERVICE** by causing copies to be personally delivered to the person(s) served as

15   follows:

16   \_\_\_\_  **FACSIMILE** by causing such document to be transmitted by facsimile machine to the office(s)

17   of the party(s) indicated below.  The facsimile machine used complied with Rule 2003 and no error

18   was reported by the machine.

19        I declare under penalty of perjury and the laws of the United States of America that the

20   foregoing is true and correct.

21        Executed on November 15, 2004, at San Diego, California.

22

23   Annie S. Parrish

24

25

26

27

28

---

## SERVICE LIST

| | |
|---|---|
| Todd G Friedland<br>Pillsbury Winthrop<br>650 Town Center Drive, 7th Floor<br>Costa Mesa, CA  92626-7122<br>Tel:  714-436-6800<br>Fax: 714-436-2800 | **Attorneys for Defendant American International Group, Inc. and A.I. Credit Consumer Discount Company** |
| Marta B. Arriandiaga, Esq.<br>Ropers, Majeski Kohn & Bentley<br>515 South Flower Street, Suite 2100<br>Los Angeles, CA 90071<br>Tel:  213-312-2000<br>Fax: 213-312-2001 | **Attorneys for Defendant Julian Movsesian and Capital Management Strategies, Inc.** |
| William Von Behren, Esq.<br>Carol Lewis, Esq.<br>Meserve, Mumper & Hughes LLP<br>300 S. Grand Avenue, Suite 2400<br>Los Angeles, CA 90071<br>Tel:  213-620-0300<br>Fax: 213-625-1930 | **Attorneys for Defendant Massachusetts Mutual Insurance and C.M. Life Insurance Company** |
| Adrienne Publicover, Esq.<br>Kelly, Herlihy & Klein LLP<br>44 Montgomery Street, Suite 2500<br>San Francisco, CA  94104-4602<br>Tel:  415-951-0535<br>Fax: 415-391-7808 | **Attorneys for Defendant American General Life Insurance Company** |